# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MICHAEL J. THOMPSON, *et al.*,

    Plaintiffs,

v.                                                          Case No. 07-CV-1047

RETIREMENT PLAN FOR EMPLOYEES
OF S.C. JOHNSON & SONS, INC., and
RETIREMENT PLAN FOR EMPLOYEES
OF JOHNSONDIVERSEY, INC.,

    Defendants.

---

ANTHONY J. DECUBELLIS,

    Plaintiff,

v.                                                        Case No. 08-CV-0245

RETIREMENT PLAN FOR EMPLOYEES
OF JOHNSONDIVERSEY, INC.,

    Defendant.

---

# ORDER

The court issued an order on March 26, 2010, addressing the cross-motions for summary judgment filed by the class plaintiffs and by defendants Retirement Plan for Employees of S.C. Johnson & Sons, Inc. ("the SCJ Plan") and Retirement Plan for Employees of JohnsonDiversey, Inc. ("the JDI Plan"), collectively referred to as

("the Plans").[1] As part of its order, the court granted summary judgment to members of the SCJ Lump Sum Subclass A and the JDI Lump Sum Subclass A on their claims alleging that the Plans violated ERISA by illegally calculating lump sum payments made to plan participants who chose to receive their benefits as a single distribution prior to age 65. The Plans admitted that they did not properly project future interest credit earnings to normal retirement age before discounting them to the present (a so-called "whipsaw" calculation). However, the parties disagreed about the interest projection rate which should be applied to determine the underpayment of benefits to plan participants taking pre-retirement age lump sum distributions. Each side presented a proposed interest crediting rate for use in recalculating the lump sum payments and urged the court to endorse its proposed rate. The court denied summary judgment on the issue of an appropriate interest crediting rate and ordered the Plans to recalculate the lump sum distributions in accordance with the law and to submit the results to the plaintiffs. In the event that the parties remained unable to reach agreement on an appropriate interest crediting rate to apply, the court provided the parties an opportunity to re-submit the issue to the court through supplemental filings. After receiving the court's decision, the Plans selected and applied a different future interest crediting rate method than previously proposed and recalculated the lump sum payments. The plaintiffs objected to the

---

[1] For a detailed background on the plaintiff class and the facts underlying the case and claims, please see the court's March 26, 2010 order. *Thompson v. Retirement Plan for Employees of S.C. Johnson & Sons, Inc.*, Case Nos. 07-CV-1047, 08-CV-0245, 2010 WL 1257815, at *1-3 (E.D. Wis. Mar. 26, 2010).

selected crediting rate method and the parties now present the matter to the court for final resolution.

**BACKGROUND**

The Plans recalculated lump sum distributions for members of the SCJ Lump Sum Subclass A and JDI Lump Sum Subclass A and submitted their determinations to the plaintiffs. Prior to conducting these recalculations, however, the Benefits Administration Committee for the SCJ Plan and the Plan Administrative Committee for the JDI Plan ("the Committees") had to determine which interest crediting rate methodology to apply in order to comply with the requirements of the law and the court's directive. The Committees were tasked with investigating potential interest crediting rates and making a final determination because each Plan vests its respective administration committee with the "exclusive right to interpret the Plan and to decide any and all matters arising thereunder." (SCJ Plan, Dk #130-1, Ex. C. at § 11.3, JDI Plan, Dk #133, Ex. 1 at § 11.3).

The Committees debated several methods for selecting an appropriate interest crediting projection rate. They considered the following five options: 1) the 1.52% "spread theory" initially proposed by the Plans in their motion for summary judgment; 2) the 8.95% "stochastic modeling theory" proposed by the plaintiffs in their motion for summary judgment; 3) the flat 7.25% rate advanced by the plaintiffs' actuarial expert; 4) a single-year projection rate based on the rate in effect for the year that a particular participant received her lump sum distribution; and 5) a five-

year modified average of the rates for the four years prior to the year a participant received her lump sum distribution and a 4% rate for the year of distribution. The Committees ultimately decided upon the latter option.

The modified five-year average approach uses both a 4% set crediting rate for the year in which a participant received her lump sum distribution, and the actual crediting rates in effect during the four years immediately preceding the year of distribution (unless the rate was less than the 4% floor for Annual Earnings Credits).[2] The Committees rely upon a treasury regulation and the terms of the respective plans to justify their approach. The Plans base their selection of a five-year average of interest crediting rates on Treasury Regulation § 1.401(a)(4)-(8)(c)(3)(v)(B), which was referenced by the Seventh Circuit Court of Appeals in *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003), a class action case similarly alleging "whipsaw" claims against a defendant pension plan for underpayment of lump sum distributions to pre-retirement age participants. The regulation states that a cash balance plan must project future interest credit by assuming that the interest rate for future periods up to normal retirement age are:

> ...either the current value of the variable interest rate for the current period **or** the average of the current values of the variable interest rate for the current period and one or more periods immediately preceding the current period (not to exceed 5 years in the aggregate).

---

[2]The Plans credit the notional cash balance accounts of plan participants with Annual Earnings Credits equal to 4% interest or 75% of the rate of return generated by the Plan's Trust for that year, whichever is greater. Therefore, the interest crediting rate for a particular year can never be less than 4%.

Treas. Reg. § 1.401(a)(4)-8(c)(3)(v)(B) (emphasis added). The Plans do not use a straight average for the preceding five years, however. Instead, they include an automatic 4% crediting rate for the year in which a plaintiff took her lump sum distribution. The use of the 4% crediting rate within the five-year average purportedly arises from the terms of the Plans. The SCJ and JDI Plans both state that earnings for the "year in which distribution is made or begins" are credited at a "rate of 4%." (SCJ Plan, Dk #130-1, Ex. C at § 5.3(c); JDI Plan, Dk#133, Ex. 1 at § 5.3(c)(2)(B)(iii)) and Dk #235, Ex. 1 at § 5.3(c)). Thus, under the Plan language, a 4% crediting rate must always be applied to determine the value of a plan participant's benefits for the year in which she receives her benefits distribution. The Committees concluded that this plan language compelled them to include a 4% interest crediting rate as part of the five-year average.

The modified five-year average method requires that the Plans recalculate lump sum distributions using a 4% rate, as well as the actual crediting rates for the four years immediately preceding the year in which an individual class member received her distribution. Therefore, the approach requires use of the actual annual crediting rates for the Plans (under the Plans' formula crediting 75% of Annual Trust Returns or 4%, whichever is higher). The actual crediting rates for the relevant period[3] are as follows:

---

[3] The table depicts rates for the SCJ plan beginning in 1998 because that is the year that SCJ Plan adopted a cash balance formula, while rates for the JDI Plan do not begin until 1999 because that is the year the JDI Plan came into existence.

| YEAR | SCJ PLAN | JDI PLAN |
|------|----------|----------|
| 1998 | 10.08%   | N/A      |
| 1999 | 19.75%   | 19.75%   |
| 2000 | 4.00%    | 4.00%    |
| 2001 | 4.00%    | 4.00%    |
| 2002 | 4.00%    | 4.00%    |
| 2003 | 17.83%   | 12.68%   |
| 2004 | 10.88%   | 8.75%    |
| 2005 | 6.14%    | 5.86%    |
| 2006 | 10.14%   | 7.02%    |

The Plans employed the actual crediting rates within its modified five-year average method for projecting future interest credit based on the year in which a participant took her lump sum distribution. When the Plans applied their methodology, it resulted in the following rates for purposes of recalculating lump sum distributions made in a given year:

| YEAR | SCJ PLAN | JDI PLAN |
|------|----------|----------|
| 2001 | 10.49%   |          |
| 2002 | 8.37%    | 8.37%    |
| 2003 | 7.15%    | 7.15%    |
| 2004 | 6.77%    | 5.74%    |
| 2005 | 8.14%    | 6.69%    |
| 2006 | 8.57%    | 7.06%    |

Recalculation of lump sum benefits using the modified five-year average method employed by the Plans results in additional payments for 93% of the SCJ Lump Sum Subclass A members and 100% of the JDI Lump Sum Subclass A members. The Plans notified the class plaintiffs of their selected methodology on June 24, 2010,

and provided spreadsheets listing the additional payments each class member would receive under the recalculation. However, the plaintiffs did not accept the modified five-year average as a fair and unbiased estimate of the actuarial equivalent of their lump sum distributions at normal retirement age and urge the court to endorse an alternative future interest crediting rate method.

**ANALYSIS**

The court must now determine whether the modified five-year average method applied by the Plans to recalculate lump sum distributions is an appropriate rate for determining the value of under-payments, or whether an alternative method must be applied to ensure that class members receive the full value of their pension benefits. The Plans argue that they selected a reasonable and appropriate approach and that the court should grant deference to their chosen methodology. The class plaintiffs, however, argue that the Plans' interest crediting rate method does not merit deference and urge the court to reject it as a violation of law. The plaintiffs argue that the court must select an interest crediting rate that represents a "best estimate" and not merely a "fair estimate" of future interest credits.

Neither case law nor regulations specify the particular interest crediting rate that the Plans must apply to project the interest credits forward to normal retirement age in order to conduct a whipsaw calculation that complies with the law. Instead, the Seventh Circuit Court of Appeals states that a determination of future interest credits is inherently imprecise for cash balance plans that contain variable interest

crediting formula; plans such as the SCJ and JDI Plans. The Seventh Circuit notes that when future interest credits are not fixed, resolving equivalent value of benefits for pre-normal retirement age lump sum recipients involves "estimation rather than determination." *Berger v. Xerox*, 338 F.3d 755, 760 (7th Cir. 2003). Cash balance plans must predict the value of future interest credits that would have been earned if a given participant had left their benefits in their notional account until age 65. A prediction of future value is necessarily inexact. Thus, the law can only require that a plan include an "estimate" of future interest credits when calculating the value of a participant's benefits for lump sum distribution. The Seventh Circuit describes the requirement as a "fair estimation" of future interest credits. *Id.* at 761.

The plaintiffs argue that a "fair estimate" is insufficient and assert that the Plans must apply a methodology for projecting future interest that represents a "best estimate." The court disagrees and will not presume to read "best" into the Seventh Circuit's use of the term "fair." A "fair estimate" requires a reasonable and unbiased prediction of interest credits, but not certainty that the methodology for prediction comes closest to the actual rate over time. Therefore, the court will require only a "fair estimate" and not a "best estimate" when considering the Plans' proposed method for projecting future interest credits in the instant case.

The Plans propose a modified five-year average method for calculating the future interest which they were required to, but did not, include in the original lump sum distributions made to plan participants. The Plans urge the court to apply

deference to their selected methodology and consider only whether the plan administrators acted arbitrarily and capriciously in adopting the method. In contrast, the plaintiffs argue that a determination of damages caused by underpayments is a legal determination and assert that the Plans' methodology does not warrant any deference from the court.

The Plans cite to *Conkright v. Frommert*, 130 S.Ct. 1640, 176 L.Ed.2d 469 (2010) for the proposition that the court must give deference to their proposed interest crediting rate method. In *Conkright*, the United States Supreme Court held that a plan administrator is entitled to the deference afforded under *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989), even when the plan made a previous determination that violated ERISA. 130 S.Ct. at 1646-47. The Supreme Court explained that in *Firestone,* it held that a plan administrator with discretionary authority to interpret a plan is entitled to deference when the administrator exercises that discretion. *Id*. at 1644. (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989)). The *Conkright* case considered whether a plan administrator forfeits *Firestone* deference after making an initial decision that violates ERISA and then rendering a new decision on the same issue. The Supreme Court determined that a plan administrator does not forfeit deference under these circumstances.

The Plans believe the facts of *Conkright* are analogous to the facts in the instant case and require the court to apply deference to their modified five-year average method. In *Conkright,* the class plaintiffs were employees of Xerox

Corporation who left the company and received lump sum distributions of their pension benefits, but were later rehired. *Id.* at 1645. The plaintiffs filed suit challenging the plan's method of calculating their benefits to discount the distributions the plaintiffs previously received in order to avoid crediting the plaintiffs twice. *Id.* To effect the discount of previous distributions, the plan administrator employed an approach known as the "phantom account" method. *Id.* The plaintiffs filed suit challenging use of the phantom account method and the district court granted summary judgment to the plan. *Id.* The Second Circuit Court of Appeals reversed the lower court's finding and held that use of the phantom account method was unreasonable. *Id.* On remand, the district court was left to consider other approaches for adjusting plaintiff benefits to account for the prior lump sum distributions. *Id.* The plan administrator addressed the issue a second time and proposed an alternative approach for calculating benefits. *Id.* The district court, however, refused to apply a deferential standard of review to the administrator's new determination and instead adopted an approach proposed by the plaintiffs. *Id.* The Court of Appeals affirmed the district court's decision not to apply a deferential standard on remand because the plan administrator's previous determination had violated ERISA. *Id.* at 1645-46. The Supreme Court rejected the "one-strike-and-you're-out" approach to deference and held that the district court wrongly refused to grant deference to the plan administrator's second proposed calculation method. *Id.*

at 1646-47. The Supreme Court's decision essential held that an initial mistake does not strip a plan administrator of deference.

The implications of *Conkright* for the court's decision here is debatable. The plaintiffs argue that *Conkright* is inapplicable to this court's resolution of an appropriate interest crediting rate because selection of a crediting rate to remedy past underpayments is a determination of law and not a determination within the discretionary authority of the plan administrators. Plaintiffs note that in *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 08-CV-127, 2010 WL 2264954 (W.D. Wis. June 3, 2010), a nearly-identical case pending in the United States District Court for the Western District of Wisconsin, the court found that *Firestone* deference did not apply because IRS Notice 96-8 prohibits a plan administrator from exercising discretion in conducting a whipsaw calculation and because the plan design itself called for an illegal calculation of benefits. *Id.* at *25. Here, as in *Ruppert*, the plan design and not merely the plan administrator's interpretation of plan language calls for application of an illegal method of projecting future interest credits. Thus, *Conkright* is arguably inapplicable because the Plan's modified five-year average approach is not an interpretation of existing plan terms, which is undoubtedly an exercise of plan administrator discretion, but is a method of calculating damages suffered by the class plaintiffs as the result of an illegal calculation of lump sum distributions.

However, the selection of an initial or alternate method for projecting future interest credits does involve the exercise of discretion. Predicting the value of future credits an employee would have earned if they left their benefits in the notional account until age 65 is educated guesswork without a single right answer. There are competing models for projecting future interest credits and selection of one particular methodology over another *is* an exercise of discretion. The Plans exercised their discretion illegally by applying a rate for projecting interest credits that equaled the rate for discounting the credits back to the present when they originally calculated lump sum payments for plan participants. The court cannot now order the Plans to comply with the law by applying "the correct" interest crediting rate because no single right crediting rate exists for making an estimation. For this reason, the court directed the question back to the Plans for a redetermination. The calculation (or recalculation) of participant benefits is the province of a plan administrator and is an exercise of a plan administrator's discretion to "interpret the Plan and to decide any and all matters arising thereunder." (SCJ Plan, Dk #130-1, Ex. C. at § 11.3, JDI Plan, Dk #133, Ex. 1 at § 11.3).

The court believes that *Conkright* supports referral of the interest crediting rate question to the Plans and compels a grant of deference to the Plans' proposed method for recalculating lump sum distributions. The Plans initially employed a method for projecting future interest credits that violated ERISA when calculating lump sum distributions of benefits owed to the plaintiffs. The Plans now propose an

alternative method of projecting the value of these credits that results in revised determinations of benefits owed. As stated in *Conkright*, an initial exercise of discretion that fails to comply with ERISA does not disqualify a subsequent exercise of discretion from receiving deference. Selecting a method for generating a "fair estimate" of future interest credits is an exercise of discretion because the law does not require the use of one particular approach. The Plans failed on their first attempt to select a methodology and now make a second attempt. Because the selection of a methodology is an exercise of discretion and because an initial failure does not strip plan administrators of deference, the court will begin its resolution of the interest crediting rate issue by considering the reasonableness of the Plans' proposed method.

The court will, therefore, evaluate the modified five-year average method and its justifications and determine whether the proposed crediting rate complies with the requirements of the law. If the method does not constitute a "fair estimate" of future interest credits, then the determination is unreasonable and the court cannot endorse the methodology. The Plans ground their modified five-year average approach in an IRS regulation addressing how cash balance plans may comply with anti-discrimination rules in the tax code. They rely upon Treasury Regulation § 1.401(a)(4)-8(c)(3)(v)(B) because the Seventh Circuit Court of Appeals referenced the regulation in discussing the underpayment of lump sum distributions in *Berger*. In that case, just as in the instant case, the future interest credits used by the

defendant Xerox Pension Plan were not fixed. Instead, the interest credits provided for by the plan fluctuated with the one-year Treasury bill rate. *Berger*, 338 F.3d at 760. Because the Treasury bill rate varied over time, the defendant pension plan had to estimate the value of the future credits in determining the actuarial equivalent of a lump sum distribution made to plan participants who chose to take their benefits as a one-time payment prior to age 65. *Id*. The Seventh Circuit identified permissible methods of calculating future interest credits as those laid out by the treasury regulation, including: 1) using the current rate in the year of distribution; or 2) averaging the rates from several recent years. *Id*. The Seventh Circuit went on to state that the regulation "requires that one of these two methods be used." *Id*. (citing Treas. Reg. § 1.401(a)(4)-8(c)(3)(v)(B)). The Seventh Circuit does not explicitly mention a five-year time period for averaging rates from recent years. The regulation upon which the court relies, however, states that such an average is "not to exceed 5 years in the aggregate." Treas. Reg. § 1.401(a)(4)-8(c)(3)(v)(B). On the basis of the regulation and *Berger*, the Plans conclude that using the average of interest crediting rates for the five years preceding distribution constitutes a fair estimate of future interest credits.

The conclusion is reasonable. The crediting rate for the Xerox plan in *Berger* relied upon the Treasury bill rate, which is variable. The interest credits for the SCJ and JDI Plans similarly rely on a variable crediting formula. Therefore, the Seventh Circuit's statements approving an average method for determining future interest

credits suggests that such an approach is permissible here. Further, the plaintiffs do not object to the use of an average of earning crediting rates for prior years. Instead, they argue that five years is too short a period for calculating an average because it creates too great a danger of undervaluing the interest credits. The plaintiffs encourage the court to include "as much valid data as possible" in averaging past crediting rates and suggest that the court use SCJ Plan trust return data going back to 1977. (Pls.' Suppl. Br., at 13). Using thirty years of data is certainly one method of obtaining an average. However, it exceeds the period contemplated by the Seventh Circuit's reference to an average of rates from "several recent years." *Berger*, 338 F.3d at 760. It also exceeds the period contemplated by the treasury regulation relied upon by the Seventh Circuit, which anticipates an average of rates from "one or more periods immediately preceding the current period." Treas. Reg. § 1.401(a)(4)-8(c)(3)(v)(B). The regulation specifically states that any such averaging method is "not to exceed 5 years in the aggregate." *Id*.

Authority is sparse regarding what method a defendant plan must employ to project future interest credits to normal retirement age in determining lump sum distributions. The Seventh Circuit's statements in *Berger* provide some small measure of the only guidance on the topic. *Berger* approves use of an average of recent years' crediting rates and the regulation *Berger* cites permits an average of no more than five years. Therefore, this court finds that the Plans' selection of a five-year average methodology to be reasonable and in compliance with the law.

The five-year average is not the only aspect of the Plans' selected methodology, however. The Plans utilize interest crediting rates from the four years prior to the year in which a plan participant received her lump sum distribution in their averaging method, but the Plans also include an automatic 4% crediting rate for the year in which a participant was paid her lump sum distribution. The Plans justify use of this 4% crediting rate because the plan terms provide that 4% is the earnings credit participants receive in the year of their benefits distribution. The Plans explain that they apply a fixed 4% credit to a participant's account to enable participants to receive distributions immediately, rather than waiting for the end of the year to determine whether 75% of the annual return on plan assets for that year exceeds 4%. The court finds reliance on the 4% earnings credit language for purposes of the five-year average to be misplaced. The fact that plan language requires application of a 4% earnings credit has no bearing on whether an assumed 4% crediting rate contributes to a fair estimate of future interest credits. The plan language also required the projection method the court found to violate ERISA and which the Plans later admitted was improper.

The Seventh Circuit expressly approved projection of future interest credits based on an average of rates from prior years. It did not approve projection based on an average of actual rates along with an assumed rate that arbitrarily equals the lowest possible rate a participant could earn for the year of their distribution. Additionally, IRS Notice 96-8 states that a forfeiture of benefits occurs "if the value

of future interest credits is projected using a rate that understates the value of those credits." Notice 96-8, Sec. III.B.1. Assuming an automatic 4% rate within an average of actual prior rates underestimates the value of future interest credits and fails to comply with the requirements of the law. An average of past rates can be used to predict (imperfectly) what rates will be in the future. However, an average that includes an arbitrarily-selected rate is not an accurate depiction of what previously occurred, and thus, cannot present a plausible prediction of future occurrences. The court cannot deem the Plan's use of a 4% rate for the year of distribution a reasonable determination.

Therefore, the court will uphold the Plans' proposed use of a five-year average for the purpose of calculating future interest credits owed to class plaintiffs. However, the court will disallow use of an assumed 4% rate for the year in which distribution occurred. Instead, the court will order the Plans to apply a true five-year average in projecting future interest credits forward to age 65. This will eliminate the arbitrary use of a 4% assumption and more accurately reflect the average rate from recent prior years anticipated by *Berger* and the treasury regulation. The Plans must now apply true five-year average to determine the extent of underpayments made to individual class plaintiffs.

The court will enter final judgment for the Lump Sum Subclass A plaintiffs. Before it does so, the court must address the matter of prejudgment interest. The Seventh Circuit recognizes a presumption in favor of awarding prejudgment interest

to prevailing plaintiffs in ERISA cases to ensure full compensation of losses. *See e.g. Fritcher v. Health Care Service Corp.*, 301 F.3d 811, 819-20 (7th Cir. 2002). The Plans do not contest the appropriateness of prejudgment interest. However, the parties disagree regarding the rate to be used in awarding the prejudgment interest. The plaintiffs argue for an award of interest at the prime rate prevailing between the date of a participant's lump sum payment and the date final judgment is entered. In contrast, the Plans argue for application of a standard prejudgment interest rate for each plaintiff based on the post-judgment interest rate appearing in 28 U.S.C. § 1961.

Courts in this circuit note that prejudgment interest is appropriated assessed at the prime rate. *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436-37 (7th Cir. 1989) ("we suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate"); *see also Fritcher*, 301 F.3d 811, 819-20 (7th Cir. 2002). Further, other district courts in this circuit have applied the prime rate to cases involving whipsaw claims for the underpayment of lump sum benefits. *See Berger v. Xerox Retirement Income Guaranty Plan*, 231 F. Supp. 2d 804, 820-21 (S.D. Ill. 2002); *Ruppert*, 2010 WL 2264954, at *29. This court agrees that an award of prejudgment interest at the prime rate is appropriate and will make a similar interest award.

The only remaining question is whether the court should apply the prime rate as it stood on the date of judgment or the average of the rates from the date of the

lump sum distribution paid to each class member until the date of judgment. The Plans argue that the prime rate on the date of judgment has the advantage of simplicity because it eliminates the administrative burden of calculating an average rate for each individual class member. The United States District Court for the Western District of Wisconsin relied upon simplicity as a justification for awarding prejudgment interest at the prime rate on the date of judgment in *Ruppert*. 2010 WL 2264954 at *29. However, the plaintiffs in Ruppert did not contest the defendant's argument that simplicity compelled application of one prime rate. *Id.* Here, the plaintiffs do oppose application of a date-of-judgment prime rate and argue that average prime rates for individual class plaintiffs can be easily computed. In addition, the application of an average prime rate between the date of lump sum distribution and judgment has precedent. The United States District Court for the Southern District of Illinois made such a prejudgment interest award to whipsaw class plaintiffs in *Berger*. 231 F. Supp. 2d at 821 (awarding prejudgment interest for underpayment of lump sum distributions at the prime rate "for the period beginning on the date of the withholding of the Class members' respective benefits to the date of the entry of a final judgment and order."). The court finds that convenience of the Plans is not a sufficient reason to apply the prime rate on the date of judgment rather than the average rate from the date the Plans deprived participants of benefits. The court will award prejudgment interest on the amount of underpayments made to prevailing class plaintiffs at the prime rate for the period between the date of the

lump sum distribution made to a particular plaintiff and the date that the court enters final judgment.

Accordingly,

**IT IS ORDERED** that the Plans shall apply a true five-year average of crediting rates in determining the value of underpayments made to SCJ Lump Sum Subclass A and JDI Lump Sum Subclass A members. The court also awards prejudgment interest at the average prime rate for the period between the date a participant received their lump sum distribution and the date of the final order and judgment.

The clerk is ordered to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 19th day of August, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge