# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

MICHAEL J. THOMPSON, et al.,

        Plaintiffs,

    v.

RETIREMENT PLAN FOR EMPLOYEES OF S.C.
JOHNSON & SONS, INC., and
RETIREMENT PLAN FOR EMPLOYEES
OF JOHNSONDIVERSEY, INC.,

        Defendants.

Case No.  07-CV-1047

---

ANTHONY J. DECUBELLIS,

        Plaintiff,

    v.

RETIREMENT PLAN FOR EMPLOYEES
OF JOHNSONDIVERSEY, INC.,

        Defendant.

Case No. 08-CV-245

---

# ORDER

On September 16, 2010, plaintiffs filed a Motion to Alter or Amend Judgment (Docket #253) pursuant to Federal Rule of Civil Procedure 59(e).  The case arises from two consolidated class-action disputes under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*  Plaintiffs' motion seeks amendment of the August 19, 2010 judgment (Docket #247) entered by the court directing defendants Retirement Plan for Employees of S.C. Johnson & Sons, Inc. ("the SCJ Plan") and Retirement Plan for Employees of JohnsonDiversey, Inc. ("the

JDI Plan," collectively, "the Plans") to apply a true five-year average of crediting rates to determine the value of underpayments made to certain plaintiff subclasses. Based upon the following discussion, the court will grant the motion in part and deny it in part.

## BACKGROUND

Plaintiffs are former and current participants in the Plans who brought class action suits successfully alleging ERISA violations. Collectively, plaintiffs alleged two ERISA violations, the relevant allegation being a "lump sum" claim charging the Plans with incorrectly calculating lump sum distributions made to pre-retirement age participants. This ultimately successful claim alleged a failure to apply a "whipsaw" calculation.[1] The court certified two general classes, the "SCJ Class" and the "JDI Class." The SCJ Class includes all persons for whom the SCJ Plan ever maintained a notional account, whereas the JDI Class includes only persons for whom the JDI Plan maintained a notional account prior to January 1, 2004. The court also certified four subclasses for the "lump sum" claim relevant to this motion. These subclasses contain plan participants who received lump sum distributions prior to normal retirement age. Each general class has two subclasses, "A" and "B," distinguished by the date participants received a lump sum distribution. SCJ Lump Sum Subclass

_____

[1]A "whipsaw" calculation is the method of calculating the actuarial equivalence of the annuity a plan participant in a cash balance plan would have received if he or she had waited until normal retirement age to receive benefits. The calculation first projects a hypothetical account balance forward to retirement age at the plan's future interest crediting rate, then discounts the balance back to the appropriate value on the date the participant left the employer. *See Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755, 760 (7th Cir. 2003); *Esden v. Bank of Boston*, 229 F.3d 154, 159 (2d Cir. 2000).

A includes SCJ Plan participants who received a distribution between November 27, 2001, and August 17, 2006. SCJ Lump Sum Subclass B members received a distribution between January 1, 1998, and November 27, 2001. JDI Lump Sum Subclass A includes JDI Plan participants who received a distribution between March 13, 2002, and August 17, 2006. JDI Lump Sum Subclass B members received a distribution between January 1, 1998, and March 13, 2002.

On March 26, 2010, the court issued an order granting in part and denying in part cross-motions for summary judgment. (Docket #203). That order granted summary judgment to SCJ Lump Sum Subclass A and JDI Lump Sum Subclass A plaintiffs (collectively, "Subclass A plaintiffs") on their claims that the Plans violated ERISA §§ 203(e) and 205(g) by failing to properly calculate lump sum distributions and thus paying less than the present value of accrued benefits. However, the court declined at that time to express an opinion on the appropriate calculation of lump sum distributions, denying both parties summary judgment on the issue and instead directing the Plans to recalculate the distributions in accordance with the law. The March 26 order also granted the Plans summary judgment as to the claims of the SCJ Lump Sum Subclass B and JDI Lump Sum Subclass B plaintiffs (collectively, "Subclass B plaintiffs") because the court found the claims time-barred.

After failing to agree on an appropriate calculation, the parties submitted supplemental briefs. On August 19, 2010, the court ordered the Plans to apply a true five-year average of crediting rates to determine underpayments made to

Subclass A plaintiffs. (Docket #246). Plaintiffs now move for amendment of the underlying judgment.

## ANALYSIS

Plaintiffs raise two independent requests for amendment in their motion. The first asks the court to amend the judgment to include recovery for Subclass B plaintiffs in light of a recent Seventh Circuit opinion. The second requests the court alter the judgment in order to clarify three issues related to calculating underpayments. A court may alter or amend a judgment already entered. Fed. R. Civ. P. 59(e). Rule 59(e) states no specific standard for amending a judgment, but Seventh Circuit precedent provides guidance. An intervening change in the law justifies amendment under Rule 59(e). *Cato v. Thompson*, 118 Fed. App'x 93, 96 (7th Cir. 2004). Otherwise, such a motion requires the movant to either present newly discovered evidence, or "clearly establish[] a manifest error of law or fact." *Cnty. of McHenry v. Ins. Co. of the W*., 438 F.3d 813, 819 (7th Cir. 2006); *see also, e.g., Harrington v. City of Chi*., 433 F.3d 542, 546 (7th Cir. 2006). A "manifest error" means "wholesale disregard, misapplication, or failure to recognize controlling precedent on the part of the court." *Id.* (internal quotation omitted). However, "Rule 59 is not a vehicle for rearguing previously rejected motions." *Oto v. Metropolitan Life Ins. Co*., 224 F.3d 601, 606 (7th Cir. 2000).

Plaintiffs' argument that a recently decided Seventh Circuit case mandates that this court reverse its position on whether Subclass B plaintiffs' claims are time

barred does not satisfy the Rule 59(e) standard. That case does not represent an intervening change in the law, despite plaintiffs' creative reading, nor does its application of precedent clearly establish manifest error on the part of this court. As to the calculation issues, plaintiffs are correct that the JDI Plan may not sidestep the court ordered application of a true five-year average by claiming that there is no 1998 interest rate for it to use. The JDI Plan was spun off from the SCJ Plan and the Plans' own submissions to this court indicate that the JDI Plan contemplated using the SCJ Plans' 1998 interest rate in calculating a five-year average for those members who received a distribution in 2002. As such, the court will amend the judgment to clarify this point. However, as to the issues of whether 4% is a proper crediting rate for the year of distribution, and what specific interest rate to use for 1997, the court finds no justification sufficient to support amending the judgment. Thus, on the basis of the following analysis, the court will grant in part and deny in part the 59(e) motion.

## I.    AMENDMENT TO INCLUDE SUBCLASS B PLAINTIFFS

Plaintiffs argue that the Seventh Circuit's opinion in *Young v. Verizon's Bell Atl. Cash Balance Plan* is either an intervening change in the law, or establishes manifest error on the part of the court.[2]  Plaintiffs base their argument on two paragraphs from the case, but neither support amending the judgment. *Young* dealt with a similar, yet distinct, situation as the one in this case. There, the plaintiff,

---

[2]Plaintiffs make fleeting reference to manifest injustice as well, but essentially treat it as the same standard as manifest error, thus the court will simply analyze manifest error.

Young, received an allegedly miscalculated lump sum distribution in 1998, but did not file suit until 2005. *Young*, 615 F.3d 808, 813-14 (7th Cir. 2010). Prior to filing suit, Young filed a claim with the Claims Review Unit at Verizon in 2004, ultimately resulting in denial in 2005. *Id.* Both parties agreed that a four-year statute of limitations applied, but disagreed as to when the injury accrued. *Id.* at 816. The court of appeals found the claim was not time barred, first explaining the rule that "a claim to recover benefits under § 502(a) accrues 'upon a clear and unequivocal repudiation of rights under the pension plan which has been made known to the beneficiary.'" *Id.* (citing *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62 (7th Cir. 1996)).

## A. Intervening Change in, Disregard of, or Failure to Recognize Precedent

It is at this point in the *Young* opinion that the answer is provided. In citing *Daill*, the *Young* court clearly applies the same precedent as this court applied in finding the Subclass B plaintiffs' claims time barred. (*See* March 26, 2010 Order 20-22) (Docket #203). Plaintiffs attempt to sidestep this by claiming that they do not proffer *Young* as a *change* in the law, but rather a "binding" "understanding" of the test that is at odds with this court's. (Pl.'s Reply Br. 2) (Docket #262). But plaintiffs' argument is unclear. If they allege that this court's order was a misunderstanding, then they are alleging misapplication, which the court addresses below. If they are alleging that *Young*'s exact outcome is binding, then they are alleging either a new rule or, again, a misapplication of precedent in a factually indistinguishable scenario.

In any event, by its citation to *Daill*, *Young* is not a new rule and thus is not an intervening change in the law.

This is further evidenced from the rest of the Seventh Circuit's analysis, wherein it found that "Young did not receive a clear repudiation of her claim . . . until 2005, when Verizon's Review Committee resolved her administrative appeal. . . . Prior to denying Young's administrative claim, Verizon did not inform Young that it rejected her interpretation of the Plan." 615 F.3d at 816. It continued, disagreeing with Verizon's argument, stating that the claim did not accrue in 1998 because

> [a]t that time . . . the parties' dispute over the correct interpretation of the Plan had not developed. And nothing suggests that the . . . payment that Young received should have been a red flag that she was underpaid. The 1998 payment that Young received was not so inconsistent with her current claim for additional benefits as to serve as a clear repudiation.

*Id.* (internal citation omitted). Thus, the Seventh Circuit concluded that Young did not receive a clear and unequivocal repudiation. That is the extent of the appellate court's analysis, and displays no more than an application of the law – the same law applied here – to the facts of that case.

Plaintiffs attempt to argue that *Young* constitutes new precedent by holding that there is no "clear and unequivocal repudiation" where a participant receives payment without an explicit statement informing them that the Plan considered and rejected the alternative interpretation which would later be asserted. (Pl.'s Mot. to Alter or Amend 4). But *Young* holds no such thing. Tellingly, the *Young* court did not state that an initial disbursement, alone, may *never* serve as a clear and

unequivocal repudiation, just that the one at issue did not suffice. The court of appeals also never held that any such repudiation must be made through "explicit" statement, let alone used that term. *Young*, in fact, reaffirms that inconsistency alone can be sufficient to establish repudiation.[3] In total, these considerations thoroughly illustrate that *Young* is simply a different application, to different facts, of the same rule applied by this court. And because *Young* is not a different rule, neither can its analysis support a finding that the court effected a wholesale disregard of or failure to recognize controlling precedent. This court applied the same precedent laid out in *Daill* and thus did not disregard it or fail to recognize it. Therefore, there is no intervening change in the law or manifest error through disregard of, or failure to recognize controlling precedent.

**B.    Wholesale Misapplication of Precedent**

As to manifest error by wholesale misapplication, plaintiffs may question whether the court misapplied that same standard provided in *Daill* and cited in *Young*, but they have already requested the court to reconsider this ruling once, and the court did not find in their favor. (Pl.'s Mot. for Reconsideration) (Docket #204); (June 30, 2010 Order) (Docket #217). As previously noted, a Rule 59(e) motion is not a vehicle for re-arguing the same issue. Thus, the court may deny the motion on that basis alone.

---

[3]In describing Young's payment as "not so inconsistent" with her claim, the court implied the possibility of a payment that *is* "so inconsistent" as to serve as clear repudiation. This is bolstered by the court's indication that a payment can serve as a "red flag." Had the *Young* court intended to require an explicit statement detailing the repudiation, it would have said so.

However, for the sake of thoroughness, the court will explain the distinctions between *Young* and this case that are sufficient to place the decision outside the "wholesale misapplication of precedent" standard. Plaintiffs argue here that: (1) the Plans "did not inform" Subclass B plaintiffs of the rejected interpretation until just recently; (2) at the time of payment, the parties' dispute over the correct interpretation had not yet developed; (3) nothing suggested the amount of disbursement should have been a "red flag"; and (4) the payments were not so inconsistent with the current claim as to serve as a clear repudiation. Plaintiffs draw these objections from the text of *Young* and attempt to elevate them to elements of a new test. For the reasons discussed above, that is not the correct reading. As noted previously, a cause of action in a case such as this "accrues upon a clear and unequivocal repudiation of rights under the pension plan which has been made known to the beneficiary." *Daill*, 100 F.3d at 66. However, plaintiffs' objections do illustrate *Young*'s application of the *Daill* test and so the court will discuss and distinguish each.

### 1. Failure to Inform

In *Young*, the court noted that "[p]rior to denying Young's administrative claim, Verizon did not inform Young that it rejected her interpretation of the Plan." *Young*, 615 F.3d at 816. Plaintiffs argue that the Plans did not inform Subclass B plaintiffs that they held the wrong interpretation. However, as discussed above, "informing" a participant of repudiation does not require explicit statement; the *Young* court

merely found that the lump sum distribution was not itself sufficient to serve as notice of repudiation. Here, the court did find the distribution sufficient.

Further, repudiation need not relate to an "interpretation" at all. *Young* references an interpretation because, under the facts of the case, both parties held different interpretations of the application of the plan. In *Young*, the master plan document differed from the summary plan document and other communications between Verizon and plan members. 615 F.3d at 813-15. The master plan document contained what was eventually determined to be a scrivener's error, calling for computation of lump sum distributions by application of the same "transition factor" twice, instead of once, as intended. *Id.* Thus, Verizon, aware of the error, had always interpreted and communicated the calculation as only making use of one transition factor, whereas Young, after obtaining the master plan document, came to an interpretation that the calculation must in fact apply the transition factor twice. *Id.* That is distinguished from this case, wherein no parties ever held differing interpretations of how to calculate the lump sum distributions. Instead, here, the impropriety occurred on the basis of an altogether illegal calculation, apparent simply from the fact that distributions were the exact present value and not any increased amount that might indicate actuarial equivalence. *Daill* requires only a repudiation of *rights*. That is exactly what happened here when the Plans disbursed payment with no whipsaw adjustment, i.e., payment that was not the actuarial equivalent, as required under ERISA.

Moreover, to accept plaintiffs' argument would create a situation in which a plan member could virtually never violate the statute of limitations. According to their argument, plan members could harbor any interpretation they wished, for as long as they wished, so long as the plan never gave them a statement divining their interpretation and rejecting it. Plan members could then allow prejudgment interest to accrue in the meantime. In essence, plaintiffs argue that, while the plan document clearly required distribution of the actuarial equivalent,[4] plan members are justified in holding an incorrect interpretation, counter to the language of the plan document, and that when the plan distributed a lump sum clearly in violation of the interpretation contained in the plan document, no injury accrued because plan members either did not read or did not understand the plan. All of this runs counter to the "policy of repose" underlying statutes of limitations. *See Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 630 (2007).

Instead, *Young* is more properly read in a holistic manner, acknowledging that where a disbursement alone is insufficient notice, a plan will likely need to take additional action in order for the injury to accrue. But here, the court found a clear repudiation where plan members very obviously did not receive the actuarial equivalent of their pension at normal retirement age. This conclusion is not so grossly incorrect, in light of *Young*'s leaving the door open for a lump sum that

---

[4](Decl. of Daniel DeBaker Ex. C, at § 5.5(e)) (Docket #131-1); (Decl. of Todd Blazei Ex. 1, at § 5.5(e)) (Docket #133-1).

serves as a repudiation in and of itself, as to constitute a wholesale misapplication of precedent required for a finding of manifest error of law.

## 2. Development of Dispute

In finding a lack of clear and unequivocal repudiation, the *Young* court noted that, *in conjunction* with the fact that the payments themselves did not indicate repudiation, "the parties' dispute over the correct interpretation of the Plan had not developed." 615 F.3d at 816. However, this court found the payment itself sufficient repudiation. Further, this bit of analysis is again offered in reference to whether Verizon repudiated the *interpretation*. Because Young did not yet hold the interpretation at issue, the dispute had not developed. But this phrase should not be read out of the context of the court's whole analysis: it is not necessary that the parties have held interpretations at odds with each other, only that the Plans' actions repudiated the participants' rights under ERISA. Thus, in this case, arguing that the dispute had not yet developed is little more than arguing that the Subclass B plaintiffs had yet to determine their injury was actionable, a position the court has already rejected and need not decide again. Plaintiffs again fail to show manifest error on the part of the court.

## 3. Amount of Disbursement as Signal, and Inconsistency

Because of their close relation, the court will deal with plaintiffs' arguments regarding points three and four together. They argue that nothing about the disbursements Subclass B plaintiffs received should have been a "red flag"

indicating repudiation because they received exactly what they expected according to the Plans' description of the way the accounts and lump sum payments worked. Plaintiffs also argue that the payment received was not so inconsistent with the current claim as to serve as a clear repudiation. These points again merely re-hash arguments from the previous Rule 59(e) motion. But even addressing these points, the plan documents clearly require distribution of the actuarial equivalent. (Decl. of Daniel DeBaker Ex. C, at § 5.5(e)); (Decl. of Todd Blazei Ex. 1, at § 5.5(e)). Thus, any amount distributed to Subclass B plaintiffs that was exactly the same as present day value was clearly not the actuarial equivalent, and thus a repudiation of the right to receive such. And to the extent plaintiffs argue that Subclass B plaintiffs should not be expected to know such details, the court has already explained its disagreement with that position in its prior order on reconsideration. Plaintiffs again fail to establish manifest error.

Ultimately, plaintiffs oversimplify and misread the holdings of both this court and the Seventh Circuit in *Young*. Plaintiffs claim that this court held that any payment made "is a repudiation . . . of any claim the pensioner may ever assert for anything more," and that *Young* held that "mere payment of a cash balance lump sum . . . does not constitute such repudiation." (Pl.'s Reply Br. 2). But unfortunately for plaintiffs, both holdings are more nuanced than they make out. Because *Young* is not a change in the law, that ground is insufficient to support amending the judgment. Additionally, because the court already ruled on the issue of manifest

error, it will not rule again.  However, even were it to reach the merits, comparison of this case to *Young* does not establish manifest error.  Therefore, the court will deny the motion as to including Subclass B plaintiffs in the judgment.

## II.    CALCULATION ISSUES

Plaintiffs make three requests related to the remedy ordered.  First, they argue that the Plans should not be permitted to use the plan documents' automatic 4% earning crediting rate in determining the crediting rate for the year of distribution. Second, they argue that the JDI Plan should not be permitted to use a four-year average of crediting rates, rather than the five-year average ordered by the court, in determining  some underpayments.  Finally, the plaintiffs assert that a 1997 rate of 15.98% should be used in determining the five-year average.  In addition to the Rule 59(e) standard of intervening change in law, introduction of new evidence, or manifest error, alteration of a judgment is also permissible for purposes of clarification by the court.  *See Tri-State Bus. Machs., Inc. v. Lanier Worldwide, Inc.*, 221 F.3d 1015, 1019 n.2 (7th Cir. 2000) ("a Rule 59(e) motion could be the proper means of attacking a judgment in circumstances where the moving party seeks to change or clarify the judgment"); *Lentomyynti Oy v. Medivac, Inc.*, 997 F.2d 364, 368 (7th Cir. 1993) (agreeing that "a motion to clarify judgment may qualify as a proper Rule 59(e) motion"); *Charles v. Daley*, 799 F.2d 343, 348 (7th Cir. 1986) (accepting that Rule 59 alterations may "change[] matters of substance, or resolve[] a genuine ambiguity").  Because the court in fact ordered the Plans to use a true five-year

average in determining the extent of underpayments, it will clarify its order to reflect that the JDI Plan must use the 1998 interest rate from the SCJ Plan in constructing a five-year average for members receiving distributions in 2002. However, the court declines to amend the judgment as far as requiring recalculation of the year of distribution rates or mandating a particular 1997 interest rate be used.

## A. Crediting Rate for Year of Distribution

Plaintiffs argue that because the court found that using an automatic 4% earnings crediting rate assumption for the year of distribution in determining the five-year average for projection purposes would violate ERISA, it would also be impermissible to use the 4% rate for the year of distribution in determining the ending account balance before applying the whipsaw calculation. However, this claim was not raised before the court, and any failure of the August 19, 2010 order and judgment to prevent such use is not manifest error of law or fact, nor is there new evidence or an intervening change in the law.

"[A]n argument raised for the first time in a Rule 59(e) motion is waived." *Estremera v. United States*, 442 F.3d 580, 587 (7th Cir. 2006). The briefing, and the court's decision and order, addressed only the use of the 4% rate for projection purposes. Though plaintiffs state that they previously argued the point in their supplemental briefing on the summary judgment motion, the only discussion is contained in one sentence and an accompanying footnote. (Pl.'s Supplemental Br. in Supp. 9-10 & 10 n.14) (Docket #243). Though mentioned, it was not fully

developed as an argument. Further, to the extent plaintiffs did discuss the issue, they did so only in supplemental briefing on the question of what methodology the Plans should use in determining the proper projection rate for whipsaw calculations. At no point before the issue was narrowed to the proper projection methodology did plaintiffs discuss or otherwise draw the court's attention to this aspect of the plan as a defect. Thus, plaintiffs appear to have waived the argument.

Even if plaintiffs did not waive the argument, however, it does not persuade the court that amendment by Rule 59 is either appropriate or required. According to the specific text of the plan documents, for the year in which distribution is made, earnings are credited for that year at a rate of 4%. (Decl. of Daniel DeBaker Ex. C, at § 5.3©)); (Decl. of Todd Blazei Ex. 1, at § 5.3©)). Plaintiffs point out that the court found that rate improper for developing true five-year averages. While they are correct, the court was determining the projection rate methodology precisely because the plans did not already contain a proper one. The court's decision reflected the fact that use of an arbitrary 4% rate in the five-year average to determine a fair estimate of future credits was an unreasonable exercise of the Plans' discretionary power. Here, rather, there is no exercise of plan discretion; the year-of-distribution crediting rate is set by the terms of the plans. Nonetheless, plaintiffs assert that the use of 4% as the crediting rate in the year of distribution is a violation of ERISA because it effects a forfeiture of accrued benefits in any year where the earning credit ultimately exceeded 4%. However, according to the plans,

even if members wait until the normal retirement age to take their benefits, the benefits are calculated in the same manner, including a 4% earnings credit for the year in which payment begins. (Decl. of Daniel DeBaker Ex. C, at §§ 5.2, 5.3©), 5.5); (Decl. of Todd Blazei Ex. 1, at §§ 5.2, 5.3©), 5.5). Thus, there does not appear to be any underpayment by failing to credit members for the actual interest rate during the year of distribution when receiving a lump sum payment. Without more, plaintiffs have not shown a wholesale misapplication, disregard of, or failure to recognize controlling precedent. In the court's discretion, given that plaintiffs appear to have waived the argument and have not shown manifest error, it will decline to decide this issue on a Rule 59(e) motion.

### B. True Five-Year Average

Plaintiffs also ask for a clarification in the judgment concerning whether the JDI Plan may use a four-year average in valuing the underpayments made to members who received a distribution in 2002. The Plans argue that because the JDI Plan did not begin until January 1, 1999, there exists no fifth data point, an interest rate for 1998, from which a five-year average can be drawn. The Plans also argue that use of a four-year average is consistent with U.S. Department of the Treasury ("Treasury") regulations. Both arguments fail.

The Plans point to the table provided in the court's August 19, 2010 Order (Docket #246) wherein the court noted that there is no 1998 crediting rate for the JDI Plan. (August 19 Order at 6). It is certainly accurate to say that the JDI Plan did not

exist per se before 1999. However, the same charts illustrate why the JDI Plan can and should use the SCJ Plan's 1998 data point in constructing a five-year average. The charts, though presented in boxes with borders, are otherwise pulled directly from the Plans' own proposed findings of fact. (Defs.' Joint Supplemental Proposed Findings of Fact ¶ 49) (Docket #244). The Plans offered the charts to support their originally proposed modified five-year average methodology, in which the Plans would construct a five-year average using a 4% rate for the year of distribution. *Id.* at ¶¶ 49-52. The smoking gun appears in the Plans' own application of the method for JDI Plan members who received distributions in 2002: the resulting average is derived from using the SCJ Plan's 10.08% rate in 1998, despite a "Not applicable" rate found for the JDI Plan in 1998. *Id.* at ¶ 51, 49. Thus, it is clear to the court that even under the Plans' original conception of a five-year average, the JDI Plan anticipated using the SCJ Plan's 1998 crediting rate in constructing a five-year average for JDI Plan members. As such, the Plans are not justified in now arguing that the JDI Plan should use only a four-year average for determining the underpayment to members who received a distribution in 2002. It is of no concern that the JDI Plan technically did not exist in 1998, because it, and its members, were merely spun off from the SCJ Plan. (Def.'s Answer to Second Am. Compl. ¶ 33) (Docket #96); (Defs.' Joint Resp. to Pls.' Proposed Findings of Fact ¶ 5) (Docket #162). Moreover, the fact that the JDI Plan members were spun off lends greater support to use of the SCJ Plan's 1998 rate.

The Plans' argument that a four-year average is consistent with Treasury regulation is beside the point.[5]   A two-year or three-year average would also be consistent with Treasury regulation.   But the court ordered use of a five-year average.  Because the language of the order is apparently unclear, the court will amend the judgment to properly reflect that the JDI Plan must use the SCJ Plan's 1998 crediting rate in constructing its five-year average for members that received distributions in 2002.

## C.   Proper 1997 Rate

Finally, plaintiffs take issue with the Plans' early indication that they would use a 14.63% earnings credit for 1997 in determining a true five-year average rather than a 15.98% rate previously included in materials submitted by the Plans.  This issue arises because the SCJ Plan did not exist in its current cash balance form until 1998, meaning there exists no actual 1997 interest rate.  Though both plaintiffs and the Plans make a number of arguments as to the proper rate to be used for 1997 in determining a true five-year average, plaintiffs ultimately do not point to any intervening change in law, new evidence, or manifest error sufficient to support amendment of the court's judgment.

The court's judgment calls only for application of a true five-year average to determine the value of underpayments, and did not specify the actual rates to be

---

[5]The Plans point to Treasury Regulation § 1.401(a)(4)-8(c)(3)(v)(B), allowing the interest adjustments for plans with a variable interest rate to determine the rate by aggregating and averaging the value of the rate for the current period and "one or more periods immediately preceding the current period."

used in determining averages. Plaintiffs do not argue that this judgment was a manifest error of law, nor that there is any newly discovered evidence that justifies amending the judgment. As the court previously noted in its August 19, 2010 Order, determination of the proper method for projecting future interest credits compels a grant of deference to the Plans. *See Conkright v. Frommert*, 130 S. Ct. 1640, 1644 (2010) ("[A]n ERISA plan administrator with discretionary authority to interpret a plan is entitled to deference in exercising that discretion."). And as the court further noted in its order, there is no single "correct" interest crediting rate, but rather making such a determination is educated guesswork. To the extent that order found the Plans' interest credit rate methodology unreasonable, it was only the aspect which called for using a 4% rate for the year of distribution, as part of determining the five-year average. The court did not otherwise specify the exact interest rates for calculating the five-year averages.[6] Failure to impose specific rates was not a manifest error, as it is completely in line with *Conkright* and other cases recognizing the discretionary power held by ERISA plan administrators. Nor is there reason for the court to "clarify" its order by mandating the use (or non-use) of particular interest

---

[6]Declining to mandate a particular 1997 rate is distinguished here from the court's decision that the JDI Plan must use the SCJ Plan's 1998 rate. The 1998 rate is a known rate taken from a cash balance plan. The 1997 rate, because the SCJ Plan was not yet a cash balance plan, must necessarily be estimated.

crediting rates for 1997 in determining five-year averages. To do so would unjustifiably impinge on administrator discretion.[7]

## CONCLUSION

In sum, plaintiffs have failed to show that *Young* is an intervening change in the law, or that the court committed a manifest error of law or fact in ruling the Subclass B plaintiffs' claims time barred. Further, since plaintiffs appear to have waived the argument that use of the 4% crediting rate for the year of distribution was a violation of ERISA, and further, even considered, plaintiffs have not shown manifest error, the court will deny the motion to amend the judgment requiring use of a different rate. The court will also deny the motion as far as mandating the use of any particular interest rate for 1997 in calculating a proper five-year average because that decision is properly within the Plans' discretion, which has yet to be exercised. Finally, the court will grant plaintiffs' motion as to the JDI Plans' use of the 1998 SCJ Plan interest rate in constructing a five-year average for members who received a distribution in 2002. The JDI Plan is ordered to use the 1998 SCJ Plan interest rate, and the judgment will be amended to so reflect.

Accordingly,

---

[7]The court notes that it is not herein making a determination that a 13.01% rate for 1997 is in fact reasonable, but rather choosing not to mandate a rate where the Plans have yet to even make a final calculation and fix the original illegal distributions.

**IT IS ORDERED** that the plaintiffs' Motion to Alter or Amend Judgment (Docket #253) be and the same is hereby **GRANTED in part** and **DENIED in part**; and

**IT IS FURTHER ORDERED** that defendant Retirement Plan for Employees of JohnsonDiversey, Inc., in constructing its true five-year average of crediting rates to determine the value of underpayments for class members receiving a distribution in 2002, shall use the 1998 interest crediting rate for the Retirement Plan for Employees of S.C. Johnson & Sons, Inc.

The clerk of court is directed to amend the August 19, 2010 Judgment (Docket #247) accordingly.

Dated at Milwaukee, Wisconsin, this 18th day of November, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge